## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CARTESHA CARSON,

               *Plaintiff,*

v.

                                        Case No. 23-2388-EFM

GOLDEN OAKS HEALTHCARE, INC.,

               *Defendant.*

## MEMORANDUM AND ORDER

Before the Court is a Motion for Summary Judgment filed by Defendant Golden Oaks Healthcare, Inc., d/b/a The Healthcare Resort of Kansas City ("Golden Oaks") (Doc. 71). Golden Oaks seeks summary judgment on all of Plaintiff Cartesha Carson's employment discrimination and retaliation claims. Carson, a former Golden Oaks employee, filed this suit under Title VII,[1] the Americans with Disabilities Act ("ADA"),[2] and Kansas's retaliatory discharge law and opposes the motion. For the reasons stated herein, the Court grants in part and denies in part Golden Oaks's motion.

## I.      Factual and Procedural Background[3]

Golden Oaks runs the Healthcare Resort of Kansas City and employed Carson as the Wellness Director to manage the Assisted Living arm of the facility. Carson worked in this role from October 3, 2018, to November 29, 2023.

---

[1] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*

[2] Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*

[3] The following facts are uncontroverted unless otherwise indicated.

As Wellness Director, Carson supervised a staff of nine or ten Certified Medication Aides ("CMAs") and Certified Nurse Aides ("CNAs"). She was also responsible for admissions, discharges, assessments, marketing, and family meetings. During her time at Golden Oaks, Carson received high marks on internal and state evaluations. Golden Oaks employed several different individuals to serve as Executive Director of the facility during this same time: Garret Weston from March 2020 to August 2021; Regina Teska from August 2021 to January 2022; Jon Creason from January 2022 to December 2022; and Ryan Leiker from June 2023 through the relevant timeframe of this suit.

Carson contracted COVID-19 in November 2020. After the active infection resolved, Carson still suffered several symptoms attributable to her COVID-19 infection. These symptoms included cognitive disfunction, weight loss, respiratory problems, fatigue, and hearing loss in her left ear. Due to the ongoing effects of this infection, she was granted and took leave under the Family and Medical Leave Act ("FMLA") from February 9, 2021, to May 10, 2021.

While on FMLA leave, Carson heard from some employees at Golden Oaks that Carson's office was being cleaned out and that there was a rumor that Carson was never coming back. Shortly before returning from FMLA leave in May 2021, Weston offered Carson a different position in which she would handle the clinical duties of Wellness Director but not the management duties. Carson declined to accept this reduced role because it would remove her from the management team and because it would no longer allow her to earn certain bonuses. During Weston's conversation with Carson about the reduced role, Carson told Weston that she had heard that Tina Hicks, who was filling in for Carson, had been passing out medication. Carson was concerned that Hicks, as a CNA, did not have the qualifications to pass out medicine like a CMA. Weston responded that Hicks is a CMA. Carson disputes that Hicks has the CMA qualifications.

When she returned from FMLA leave in May 2021, Carson began to feel that she was being treated differently by Golden Oaks's management. She felt targeted by Weston because he gave her extra and different assignments that she had not been previously required to complete. At one point she overheard a conversation between Weston and other management team members in which someone called Carson "crazy" and laughed about it. Carson reported to Ebonie Strickland, Golden Oaks's HR Director, that Weston and the others were making fun of her.

In July 2021, Weston met with Carson to discuss performance issues. Weston had received reports that Carson was telling her staff that her short-term memory loss was impacting her ability to complete tasks. Weston asked Carson not to continuously express that she was suffering from short-term memory loss and encouraged Carson to use a task list and other organization methods. Carson was asked to draft a 30-day action plan following this meeting. In part due to the transition in Executive Directors that shortly followed this meeting, Carson's action plan was never implemented.

In August 2021, Teska took over as Executive Director. Carson felt that Teska treated her differently because of her race in the following ways. First, as an African American female, Carson frequently wears her hair in braids. Carson observed Teska make negative comments about braids on two occasions. On one occasion, Teska told a Hispanic employee, who had recently removed her braids, that she "look[ed] so much better now that you have your braids out." And on another occasion, when another manager said she was going to get her hair done, Teska responded, "Let me guess, you're going to get braids."

Second, Teska implemented a rule against working from home. However, a Caucasian employee was allowed to work from home. Carson claims she was treated differently because, on

some of her PTO days, she would work a few hours and try to get paid for those hours worked. Teska declined the hours because Carson was not supposed to be working on PTO.

Third, Carson claims that Teska implemented a "no leggings" policy in the facility. When Carson violated this rule, she was asked by HR not to wear leggings to work anymore. However, Carson claims that other employees were allowed to wear "jeggings," which Carson maintains are essentially leggings.

Fourth, Carson claims that she and another African American colleague were denied training opportunities. Carson had asked to take a wound care class, but Teska denied her request because there was no money. Around this same time, three Hispanic workers were sent to a CNA class. Separately, another African American employee requested to attend a manager training class, but Teska denied this request again citing that there was no money. However, a Caucasian employee was sent to this same manager training class.

Carson made two complaints about Teska. First, Carson reported to HR Director Strickland that Teska treated staff with hostility. Teska was required to apologize to staff. Teska apologized to Caucasian and Hispanic staff, but the African American staff did not receive an apology from Teska. Second, in November 2021, Carson made a claim of gender discrimination regarding Teska to Golden Oaks's compliance hotline. Carson reported that Teska treated the Assisted Living staff differently, slammed a door in Carson's face, and yelled at Carson. Golden Oaks asserts that a representative from the hotline attempted to contact Carson regarding her complaint, but Carson disputes that any efforts were made to contact her.

Throughout her time as Wellness Director, Carson expressed several concerns with Golden Oaks's operation. First, during Weston's time as Executive Director, but before Carson took FMLA leave, Carson reported that there was mold in the facility. Construction to remove the mold

from the facility was performed while Weston was Executive Director and completed when Teska was Executive Director. Next, in June 2021, Carson emailed Weston expressing her concern that the Assisted Living staff were improperly providing wound care to residents as they were not qualified to provide wound care. And on several occasions, Carson would not accept residents into the Golden Oaks's Assisted Living facility because the potential residents did not meet the state regulatory criteria; sometimes her decision was overridden, and on other occasions Golden Oaks's administration would react hostilely to Carson's decision.

On March 4, 2022, Carson filed an initial Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On March 7, 2022, the Kansas Human Rights Commission ("KHRC") issued a letter to Golden Oaks, notifying it of Carson's charge. At this time, Creason was Executive Director. A few days after she filed her charge, Creason called Carson into his office, held a letter that Carson believed related to her charge, and told her "You know, this affects the building. These people that did this to you are no longer here, but you do what you have to do." That same day, Carson reported her interaction with Creason to HR Director Strickland. Shortly after this meeting, on March 11, 2022, Creason emailed Carson expressing his "expectations" of Carson's leadership.

On June 6, 2023, the EEOC issued Carson a Notice of Right to Sue. Leiker took over as Executive Director in mid-June 2023, and HR made him aware of the EEOC determination. Shortly after arriving, Leiker began hearing concerns about Carson from residents and employees. The parties dispute what Leiker did in response to these complaints. Golden Oaks and Leiker say that he held coaching sessions and meetings with Carson on June 27, August 4, September 22, October 11, and October 30, 2023. Carson disputes that any of these meetings took place.

On September 5, 2023, Carson filed suit in this Court. On November 29, 2023, Leiker met with HR Director Strickland about Carson. In that meeting, HR Director Strickland advised against terminating Carson's employment because there had been no prior discipline under a progressive discipline policy such that there was not a sufficient basis to terminate Carson's employment. Strickland describes the progressive discipline policy as including counseling, written warnings, and then termination. Leiker informed HR Director Strickland that he did not intend to terminate Carson but rather was likely going to place her on a performance improvement plan. Later that same day, Leiker fired Carson.

The next day, on November 30, 2023, Golden Oaks was served with Carson's Complaint in this suit. Leiker was unaware of Carson's lawsuit against Golden Oaks before the summons was served. About a week or two after Carson was terminated, Leiker held a meeting with staff in which he conveyed that Carson's termination "was something they ha[d] been trying to do for a long time."

Carson's suit consists of three Counts. Count I is brought under Title VII and makes claims of race discrimination, hostile work environment, and retaliation. Count II makes the same claims, but Carson brings them under the ADA based upon her disability of enduring symptoms from her COVID-19 infection. Count III is a retaliatory discharge claim brought under Kansas state law. On May 7, 2025, Golden Oaks filed for summary judgment on all of Carson's claims. A timely Response and Reply were filed. The matters are now fully ripe for the Court's ruling.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[4] A fact is

---

[4] Fed. R. Civ. P. 56(a).

"material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[5] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[6] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[7] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[8] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[9]

### III.    Analysis

### A.    Count I: Title VII Claims

In Count I, Carson claims that Golden Oaks violated Title VII in various ways: (1) discriminating against her based upon her race, (2) subjecting her to racial harassment through a hostile work environment, and (3) by retaliating against her. The Court will address each claim in turn.

#### 1.    Race Discrimination

Violations of Title VII are proven "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas*."[10] Carson does not contend that

---

[5] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[6] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[8] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[9] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[10] *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

she has direct evidence of her claim of race discrimination, so the Court will analyze this claim under *McDonnel Douglas*. Under this three-step framework, a plaintiff must first prove a prima facie case which depends on the type of claim brought.[11] Second, if the plaintiff makes her prima facie showing, "the burden shift[s] to the employer to prove a 'legitimate, non-discriminatory reason for the adverse employment action.'"[12] Third, if the employer does so, "the burden shifts back to the plaintiff to show that the plaintiff's protected status was a determinative factor in the employment decision or that the employer's explanation is pretext."[13] The Court will address each step of the framework for Carson's Title VII employment discrimination claims in turn.

a.   Carson's Prima Facie Case

For a Title VII employment discrimination claim, a plaintiff must make a prima facie showing that "(1) 'she is a member of a protected class,' (2) 'she suffered an adverse employment action,' and (3) 'the challenged action occurred under circumstances giving rise to an inference of discrimination.'"[14]

Carson meets the first two elements of her prima facie case. The parties do not dispute that Carson belongs to a protected class as an African American female, satisfying the first prong. As to the second prong, Golden Oaks makes several arguments against categorizing any incident other than Carson's termination of employment as an "adverse employment action." But Carson asserts that Golden Oaks stipulated to the second prong when it stipulated that Carson was terminated from her employment with Golden Oaks. By pointing to this event only, it appears that Carson

---

[11] *See McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1137 (10th Cir. 2024) (citing *Khalik*, 671 F.3d at 1192) (discrimination); *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008) (retaliation).

[12] *Id.* (quoting *Barlow v. C.R. Eng., Inc.*, 703 F.3d 497, 505 (10th Cir. 2012)).

[13] *Id.* (quoting *Khalik*, 671 F.3d at 1192).

[14] *Id.* at 1139 (quoting *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015)).

concedes that this is the only adverse employment action she suffered. As such, the Court will not address Golden Oaks's arguments related to the other incidents. Rather, it will recognize Carson's termination as an adverse employment action sufficient to satisfy the second prong of her prima facie case.

Golden Oaks argues that Carson cannot meet the third prong of her prima facie case because she has not identified similarly situated employees who were treated differently than her. Golden Oaks reaches this conclusion because it describes the third prong of the prima facie case as "disparate treatment among similarly situated employees."[15] The Tenth Circuit acknowledges that it has "articulated the elements of a prima facie Title VII discrimination claim differently from case to case."[16] And the "similarly situated" inquiry is one of the methods by which a prima facie case can be made.[17] However, the "critical prima facie inquiry . . . is whether . . . [the] adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination."[18] Circumstances sufficient to satisfy this burden include "'suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.'"[19] This is not an onerous burden.[20]

---

[15] *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (describing the third element of a prima facie case of discrimination under Title VII as "disparate treatment among similarly situated employees").

[16] *McNellis*, 116 F.4th at 1139 (collecting cases).

[17] *Id.* at 1139 n.13.

[18] *Id.* at 1139 (quoting *Barlow*, 703 F.3d at 505).

[19] *Gudenkauf v. Stauffer Commc'ns, Inc.*, 922 F. Supp. 465, 471 (D. Kan. 1996) (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

[20] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citations omitted).

Here, Carson offers several circumstances from which an inference of discrimination may be drawn. First, Carson asserts that three or four other African American employees were terminated at or near the time she was terminated. Next, she points to the several incidents she describes as racially motivated: differential application of dress codes, disallowing remote work for her but allowing it for other employees, negative comments directed toward African American attributes like braids, and the denial of training opportunities for her and another African American colleague.

Circumstances that courts have found sufficient to give rise to an inference of a discriminatory motive are "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus."[21] The terminations of other African American employees and the comments about braids are actions and remarks that could be viewed as reflecting a discriminatory animus. Another circumstance that could give rise to an inference of discrimination is the "preferential treatment given to employees outside the protected class."[22] The denial of training opportunities for Carson and another African American employee could be viewed as preferential treatment given to employees outside the protected class. When viewed in the light most favorable to Carson, these are circumstances that give rise to an inference of unlawful discrimination sufficient to satisfy the third prong of Carson's prima facie case. Accordingly, the burden shifts to Golden Oaks to offer a legitimate non-discriminatory reason for Carson's termination.

---

[21] *Id.* at 1101 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).

[22] *Id.*

b.    Golden Oaks's Proffered Reason for Terminating Carson's Employment

Golden Oaks must clearly set forth, through the introduction of admissible evidence, the reason for the adverse employment action.[23] The "burden at this stage is one of production, not one of persuasion."[24]

Golden Oaks asserts that it terminated Carson for performance issues, presenting Leiker's declaration and contemporaneous documentation of complaints he received from residents and staff at the facility about Carson. Golden Oaks also submits a timeline created by Leiker that documents his meetings with Carson discussing these complaints. Ultimately, Leiker documents that he terminated Carson because he continued to hear complaints about her behavior from staff, residents, and family members. These documents are sufficient to meet Golden Oak's "exceedingly light" burden[25] of proffering a legitimate, non-discriminatory reason for terminating Carson. As such, the burden shifts back to Carson to show that her protected status was a determinative factor in the employment decision or that Golden Oaks's explanation is pretext.

c.    Pretext

Carson argues that Golden Oaks's proffered reason for terminating her employment was pretextual. Pretext can be shown (1) "with evidence that defendant's stated reason for the adverse employment action was false or unworthy of belief;" (2) "with evidence that defendant acted contrary to a written company policy;" or (3) "with evidence that defendant acted contrary to an unwritten policy or contrary to company practice."[26] A plaintiff produces sufficient evidence of

---

[23] *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981).

[24] *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

[25] *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (citing *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011)).

[26] *Degraw v. Exide Techs.*, 744 F. Supp. 2d 1199, 1208 (D. Kan. 2010) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)), *aff'd*, 462 F. App'x 800 (10th Cir. 2012).

pretext when she shows "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence' and hence infer that the employer did not act for the asserted nondiscriminatory reasons."[27] Carson offers evidence that creates a genuine dispute of material fact as to whether Golden Oaks's reason for termination was unworthy of belief and/or contrary to company practice.

First, Carson offers evidence that Golden Oaks's reason for termination is unworthy of belief. Recall that Golden Oaks relies on Leiker's timeline of events and his documentation of coaching sessions he conducted with Carson regarding her performance issues. Carson disputes that any of these sessions with Leiker took place. Specific to one meeting, Carson offers a text message sent by her to Leiker on the morning of September 22, 2023. In that text, she indicated that she would be absent from work that day because she was not feeling well. But, in his timeline of events, Leiker documents that he held one of these sessions with her on that same day. Thus, Carson's evidence calls into question the accuracy and veracity of Leiker's timeline.

Next, Carson offers evidence that her termination was contrary to Golden Oaks's practice. Carson submits a declaration from HR Director Strickland. In this declaration, Strickland asserts that Golden Oaks followed a progressive discipline procedure, which included counseling, written warnings, and then termination. Further, she avers that she spoke with Leiker immediately before Leiker terminated Carson. In that conversation, Strickland advised against terminating Carson because there had been no previous discipline and there were insufficient grounds to terminate Carson. According to Strickland's declaration, Leiker indicated that he did not intend to terminate

---

[27] *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (quoting *Plotke*, 405 F.3d at 1102).

Carson's employment but rather place her on an improvement plan. In the light most favorable to Carson, Strickland's declaration provides evidence that Golden Oaks had a practice of progressive discipline and that Carson's termination deviated from that practice.

Once Carson "presents evidence sufficient to create a genuine factual dispute regarding the veracity of [Golden Oaks's] nondiscriminatory reason" the Court presumes a jury could infer that Golden Oaks acted for a discriminatory reason and must deny summary judgment.[28] Accordingly, the Court finds that Carson has presented evidence that could be viewed as inconsistency or implausibility in Golden Oaks's proffered reason for terminating Carson. Because there is a genuine dispute as to a material fact, summary judgment is inappropriate on Carson's Title VII race discrimination claim.

### 2.    Harassment/Hostile Work Environment

To make a prima facie showing of harassment amounting to a hostile work environment under Title VII, a plaintiff must show:

 (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.[29]

Golden Oaks asserts that it is entitled to summary judgment because Carson cannot show any harassment Carson experienced was severe or pervasive enough to meet the fourth element of her prima facie case.

 "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is

---

[28] *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)).

[29] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (alterations omitted) (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)).

beyond Title VII's purview."[30] Severity and pervasiveness are independent grounds sufficient to sustain a hostile work environment claim.[31] "A sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute."[32] There is "no talismanic number of incidents needed to give rise to a hostile discrimination claim. Whether a hostile environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents."[33]

Carson offers several incidents that she argues form a pattern of harassment based upon her race. First, Teska made disparaging comments about braids—a hairstyle that Carson asserts is characteristic of African Americans. Second, Carson asserts that the no leggings policy was enforced against her and not others. Third, Teska did not apologize to Carson or other African American staff after Carson complained about Teska's treatment of staff. Finally, Carson avers that she and another African American colleague were denied training opportunities while others were given them. In the background of these incidents, Carson was subjected to increased scrutiny and criticism of her leadership, including being falsely accused of making errors. Further, Carson argues that the criticism she received contradicts her high scores on state and internal assessments.

Carson does not argue that any incident was sufficiently severe to independently carry her claim. And none of the events described above are especially egregious or extreme such that they meet the severity standard for a hostile work environment claim.[34] As such, the Court will move on to analyze the pervasiveness of the harassment.

---

[30] *Iweha v Kansas*, 121 F.4th 1208, 1221 (10th Cir. 2024) (citation omitted).

[31] *Id.*

[32] *Id.* (alterations omitted) (quoting *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008)).

[33] *Id.* (alterations omitted) (quoting *Tademy*, 614 F.3d at 1143).

[34] *See Morris v. City of Colo. Springs*, 666 F.3d 654, 667 (10th Cir. 2012) (noting that, to be considered severe, "courts have required the conduct to be especially egregious or extreme"); *cf. Iweha*, 121 F.4th at 1224–25

To properly analyze pervasiveness, the Court must consider all of the incidents under a totality of the circumstances assessment.[35] The most overtly race-based incident described by Carson are the comments Teska made about braids. Although Teska's comments have racial undertones, they do not amount to the use of a racial slur. But even if Teska's comments were construed as slurs, "'sporadic slurs' are insufficient; there must be a 'steady barrage of opprobrious comments' based on race."[36] Teska's two comments about braids cannot be said to be a steady barrage of opprobrious comments.

Next, Carson acknowledges that the dress code enforcement was a race-neutral action but asserts that it could be viewed as part of the pattern of harassment. "'[F]acially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct.'"[37] As such, the Court will include this race-neutral action in its consideration of the totality of the circumstances. Although Teska's non-apology to Carson and other African American colleagues is rude, it is more akin to "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces . . . [rather than] the stuff of a Title VII hostile work environment claim."[38] However, denying training opportunities to Carson and another African American colleague could be considered discrete incidents of discrimination. But Carson

---

(discussing cases in which courts found the conduct was "severe" for purposes of establishing a hostile work environment).

[35] *Lounds*, 812 F.3d at 1223–24 ("Much like a play cannot be understood on the basis of some of its scenes but only on its entire performance, which is the sum total of those scenes, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario, which is informed by the sum total of those incidents." (alterations and citation omitted)).

[36] *Iweha*, 121 F.4th at 1223 (alterations omitted) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).

[37] *Id.* at 1221–22 (quoting *Lounds*, 812 F.3d at 1224).

[38] *Id.* at 1223 (quoting *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012)).

offers no evidence to demonstrate that she and the three individuals who were sent to a CNA class were similarly situated. It is uncontroverted that the Wellness Director is a unique position with different job duties from any other position or employee at Golden Oaks. Further, Carson does not claim that the wound care class necessary to fulfill her duties as Wellness Director. As such, there is no evidence from which to infer that Teska treated these three employees more favorably than Carson.

Overall, in the light most favorable to her, Carson alleges a handful of uncomfortable—but not severe—incidents. Even viewed against the background of the increased scrutiny placed on Carson, these few incidents do not meet the "extremely high bar that a plaintiff typically must surpass in order to successfully make a claim that their work environment was not just uncomfortable at times, but overtly hostile in an unlawful way."[39]

Because Carson does not demonstrate that she was subjected to racial harassment of a severity or pervasiveness to constitute a hostile work environment, Carson cannot meet the fourth element of her prima facie case. Accordingly, Golden Oaks is entitled to summary judgment on Carson's Title VII hostile work environment claim.

### 3.    Retaliation

"To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action."[40]

Here, Carson again asserts that Golden Oaks stipulated to the first two elements of her prima facie case. Indeed, Golden Oaks stipulated that Carson filed a charge of discrimination with

---

[39] *Id.* at 1224–25 (citation omitted).

[40] *Walkingstick Dixon v. Okla., ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1339 (10th Cir. 2025) (alterations omitted) (quoting *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008)).

the EEOC on March 4, 2022; this is most certainly a protected activity.[41] And, again, Golden Oaks does not dispute that Carson's termination was an adverse employment action. As such, Carson has met her burden on the first two prongs of her prima facie case, and only the question of causation remains.

A plaintiff may establish a causal connection by showing that an "adverse action closely followed protected activity."[42] A timeframe of a month and a half between a protected activity and an adverse action is sufficient to demonstrate causation, but three months, by itself, is insufficient.[43]

Carson pieces together a few incidents that—viewed together and in the light most favorable to her—meet the causal connection of her prima facie case. Carson filed her charge with the EEOC on March 4, 2022. A few days later, Creason confronted her about her charge of discrimination saying that "you know, this affects the building. These people that did this to you are no longer here, but you do what you have to do." And just seven days after filing her charge of discrimination, Creason emailed Carson expressing concern with her leadership. Although Creason was not the decisionmaker regarding Carson's termination, Carson alleges that the scrutiny she faced increased after this interaction with Creason and continued under Leiker's tenure as Executive Director.

Leiker began at Golden Oaks in June 2023, and shortly thereafter was informed that the EEOC had issued Carson's Notice of Right to Sue. Although Carson's termination did not occur

---

[41] *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . under [Title VII].").

[42] *Walkingstick*, 125 F.4th at 1339 (alterations omitted) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[43] *Id.* (citing *Anderson*, 181 F.3d at 1179).

until at least five months after Leiker was made aware of her Notice of Right to Sue, shortly after he came on board, he began documenting his concerns with Carson's performance. Further, after Carson was terminated, Leiker told staff that they had been trying to terminate Carson for a long time. As such, in the light most favorable to Carson, a jury could find that Creason's and Leiker's statements coupled with the increased scrutiny Carson faced are sufficient to show a causal connection between Carson's EEOC charge and her termination.

Finding that Carson has made a prima facie showing of retaliation, the Court moves to the next two steps in the *McDonnel Douglas* analysis. Here, the arguments and analysis mirror the second two steps of Carson's race discrimination claim. The proffered legitimate reason for Carson's termination was performance issues, and the Court has determined Carson has raised genuine issues of material fact as to whether the proffered reason was pretextual. As such, the Court denies Golden Oaks's motion for summary judgment on Carson's retaliation claim under Title VII.

## B.     Count II: ADA Claim

### 1.     *Disability Discrimination*

The same *McDonnell Douglas* burden-shifting framework applies to Carson's ADA claim.[44] Carson must make a prima facie case of discrimination by showing (1) that she is disabled within the meaning of the ADA; (2) that she is qualified for the job held or desired; and (3) that she was discriminated against because of her disability.[45] Golden Oaks challenges the first element of Carson's prima facie case.

---

[44] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

[45] *Id.* (internal quotation marks omitted) (quoting *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218–19 (10th Cir. 2019)).

Golden Oaks asserts that Carson is not disabled within the meaning of the ADA. To show that she falls within this definition, "[a] plaintiff may show either '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'"[46]

Carson asserts that her severe and prolonged symptoms from COVID-19 are sufficient to meet the definition of "disabled" contemplated by (A). To meet this definition, a plaintiff must "[f]irst have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities.[47] "[M]ajor life activities include . . . hearing . . . speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[48] Whether Carson had an impairment and whether the impairment affected a major life activity are questions of law for the Court.[49] But "ascertaining whether the impairment substantially limits the major life activity is a factual question for the jury."[50]

Here, it is uncontroverted that Carson's symptoms included respiratory problems, weight loss, fatigue, cognitive disfunction, short-term memory issues, and partial hearing loss. These are all either physical or mental impairments. Further, it is uncontroverted that Carson had difficulty concentrating and finding the right words to speak after her infection with COVID-19. At the very least, the uncontroverted facts show that Carson's mental impairment of cognitive disfunction

---

[46] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1218 (10th Cir. 2010)).

[47] *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003) (citation omitted).

[48] 42 U.S.C. § 12102(2)(A).

[49] *Doebele*, 342 F.3d at 1129 (citation omitted).

[50] *Id.* (citation omitted).

limited her major life activities of "concentrating" and "speaking." The extent to which these major life activities were limited by her impairments is a question of fact for the jury. Accordingly, the Court has gone as far as it can in determining whether Carson was disabled within the meaning of the ADA. The parties do not appear to dispute that Carson was qualified for her job. As such, the Court will assume without deciding that Carson has met the first two prongs of her prima facie case and move along to the third prong—whether Carson was discriminated against because of her disability.

Golden Oaks challenges whether Carson can meet the third element of her prima facie case of disability discrimination—causation. To establish causation in this context a plaintiff must "'present some affirmative evidence that disability was a determining factor in the employer's decision.'"[51] This is neither an onerous or perfunctory burden and may be shown with direct or circumstantial evidence.[52] Carson may meet this burden by showing an "inference of discrimination through (1) 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus,' (2) 'preferential treatment given to employees outside the protected class,' (3) 'a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified],' and (4) a 'failure to surface plaintiff's name for positions for which she is well-qualified.'"[53] At base, Carson argues that a comparison of her work environment before and after her FMLA leave could give rise to an inference of Golden Oaks's discriminatory animus. She cites to three examples to support this inference.

---

[51] *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1197 (10th Cir. 2023) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[52] *Id.* (citations omitted).

[53] *Lincoln*, 900 F.3d at 1193 (quoting *Plotke*, 405 F.3d at 1101).

The first example is that while she was on FMLA leave staff members contacted her to tell her that Golden Oaks started to clean out her office and that the staff had been told that Carson was not returning. Aside from being hearsay, these statements are not attributable to Golden Oaks management but rather amount to rumors among staff. Accordingly, this cannot be considered a remark made by a decisionmaker. Next, Carson points to Weston's offer for Carson to take a reduced position upon her return from FMLA leave. Carson characterizes the offer as a demotion. But because this is the only instance of Carson being offered a position for which she was over-qualified, Carson cannot show a "pattern of recommending" her for positions for which she was over-qualified.[54] Finally, upon her return to work after her FMLA leave, the Assisted Living facility was out of regulatory compliance, and Carson was tasked with bringing it back into compliance. She was given additional tasks and subjected to increased scrutiny. This additional scrutiny was applied around the same time that she overheard members of management talking about Carson and describing her as "crazy."

But all of these events took place well before Leiker's arrival to Golden Oaks. At least two years had elapsed, and the Executive Director had changed out three times between the "crazy" comment and Carson's termination. Further, Carson offers no evidence that Leiker—the relevant decisionmaker—was aware of Carson's disability prior to her termination. Accordingly, due to the length of time, the several changes in leadership, and the lack of evidence demonstrating Leiker's knowledge of Carson's disability, the Court finds that Carson cannot meet the third prong of her prima facie case.

---

[54] *Id.* (quoting *Plotke*, 405 F.3d at 1101).

As such, the Court grants Golden Oaks summary judgment on Carson's disability discrimination claim brought under the ADA.[55]

## C.    Count III: Retaliatory Discharge

Carson brings a retaliatory discharge claim against Golden Oaks under Kansas state law. To bring such an action, a plaintiff must show "(1) 'a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare;' (2) 'the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee;' and (3) 'the employee was discharged in retaliation for making the report.'"[56]

Here, the Court will focus on element three—retaliatory motive. An element of the causation analysis is whether "close temporal proximity existed between the whistleblowing activity and the discharge."[57] "Proximity in time between the [report] and the firing is a typical beginning-point, coupled with evidence of satisfactory work performance and supervisory evaluations."[58]

Carson offers three examples of reports she made to support her prima facie case. First, in 2021, before she took FMLA leave, Carson reported that there was mold in the facility. Next, while Carson was on FMLA leave in 2021, Carson reported to Weston that Hicks was not a CMA but

---

[55] Although the pretrial order indicates that Count II's claims brought under the ADA are for "disability discrimination, harassment, hostile environment, and retaliation," Carson only presents argument related to her discrimination claim under the ADA. Accordingly, because it appears there are no genuine issues of material facts on Carson's other claims brought under the ADA, the Court also grants summary judgment in favor of Golden Oaks on Carson's harassment, hostile environment, and retaliation claims in Count II.

[56] *Moore v. Philips Elecs. N. Am. Corp.*, 2015 WL 5210188, at *8 (D. Kan. Sept. 3, 2015) (quoting *Palmer v. Brown*, 242 Kan. 893, 752 P. 2d 685, 690 (1988)), *aff'd*, 651 F. App'x 800 (10th Cir. 2016).

[57] *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1204 (D. Kan. 2001) (citation omitted).

[58] *Id.* (citation omitted).

had been passing out medicine. Third, in June 2021, Carson reported that the Assisted Living staff had been providing—but should not have been providing—wound care to residents. After each report, Carson says that she was met with hostility and increased scrutiny which establishes a pattern of retaliatory conduct. Indeed, Kansas courts have held that in the absence of "close temporal proximity, a plaintiff still may withstand a summary judgment motion by demonstrating a pattern of retaliatory conduct stretching from the whistleblowing activity to the termination."[59] But because Carson was terminated in November 2023, at best, Carson's last report was nearly two and a half years before her termination. It is unlikely that Kansas would recognize such a long stretch as sufficient to span the causal gap.[60]

Finally, Carson submits that on several occasions she declined to accept residents to Assisted Living because they did not meet the state's regulatory criteria. On some occasions, Golden Oaks administration would overrule her decision. On other occasions, the administration would act hostilely when she declined a resident admission. Carson provides no dates associated with these reports, leaving the Court without the ability to assess temporal proximity. Nevertheless, this is not the type of workplace dispute that amounts to whistleblowing activity.

"A worker who wants to come under the protections of [Kansas's retaliatory discharge law] must seek out the intervention of a higher authority, either inside or outside of the company."[61] It is uncontroverted that Carson declined admission to several potential residents. However, there is

---

[59] *Id.* (citation omitted).

[60] *See Rebarchek v. Farmers Coop. Elevator*, 272 Kan. 546, 35 P.3d 892, 900 (2001) ("The passage of slightly more than 5 uneventful months before [plaintiff] was discharged probably approaches the limit that would be recognized as part of a pattern for the purpose of establishing a causal connection between the protected activity and termination.").

[61] *Fowler v. Criticare Home Health Servs., Inc.*, 27 Kan. App. 2d 869, 10 P.3d 8, 15 (2000), *aff'd*, 271 Kan. 715, 26 P.3d 69 (2001).

no evidence that she sought intervention from any higher authority regarding the perceived violations. As such, Carson cannot establish that she made any report that would bring her under the protection of Kansas' retaliatory discharge law.[62]

Consequently, the Court grants summary judgment in favor of Golden Oaks on Carson's retaliatory discharge claims.

**IT IS THEREFORE ORDERED** that the Golden Oaks's Motion for Summary Judgment (Doc. 71) is **GRANTED in part and DENIED in part**.

**IT IS SO ORDERED**.

Dated this 23rd day of October 2025.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[62] *Lykins v. CertainTeed Corp.*, 555 F. App'x 791, 794 (10th Cir. 2014) ("Kansas law makes clear that reporting to a higher authority means taking actions to stop the illicit activity by reporting it to someone higher than the wrongdoer, either inside the company, if available, or outside the company, when internal channels are unavailing.").